No. 17-50154

### In the United States Court of Appeals for the Fifth Circuit

WHOLE WOMAN'S HEALTH; BROOKSIDE WOMEN'S MEDICAL
CENTER PA d/b/a BROOKSIDE WOMEN'S HEALTH CENTER and
AUSTIN WOMEN'S HEALTH CENTER; DR. LENDOL L. DAVIS; ALAMO
CITY SURGERY CENTER PLLC d/b/a ALAMO WOMEN'S
REPRODUCTIVE SERVICES; AND NOVA HEALTH SYSTEMS, INC. d/b/a
REPRODUCTIVE SERVICES, on behalf of themselves and their patients,

Plaintiffs/Appellees

v.

JOHN HELLERSTEDT, M.D., Commissioner of the Texas Department of
State Health Services, in his official capacity,

Defendant/Appellant

On Appeal from the United States District Court for the
Western District of Texas, Austin Division
Case No. 1:16-CV-1300-SS

### APPELLEES' MOTION TO DISMISS, AND TO STAY BRIEFING UNDER FIFTH CIRCUIT RULE 27.1.3.

David Brown
Molly Duane
Caroline Sacerdote
CENTER FOR REPRODUCTIVE RIGHTS
199 Water St., 22nd Fl.
New York, New York 10005

Patrick J. O'Connell
LAW OFFICES OF PATRICK J.
O'CONNELL PLLC
2525 Wallingwood Dr., Bldg. 14
Austin, Texas 78746

J. Alexander Lawrence
MORRISON & FOERSTER LLP
250 W. 55th St.
New York, New York 10019

Stephanie Toti
LAW OFFICE OF STEPHANIE TOTI
88 Atlantic Ave., Ste. 1B
Brooklyn, New York 11201

*Attorneys for Plaintiffs/Appellees*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| **Plaintiffs/Appellees** | **Counsel Who Have Appeared for Plaintiffs/Appellees in This Case** |
|---|---|
| Whole Woman's Health | David Brown |
| Austin Woman's Health Center | Molly Duane |
| Brookside Women's Medical Center d/b/a Brookside Women's Health Center and Austin Women's Health Center | Caroline Sacerdote CENTER FOR REPRODUCTIVE RIGHTS |
| | J. Alexander Lawrence MORRISON & FOERSTER LLP |
| Nova Health Systems d/b/a Reproductive Services | Stephanie Toti LAW OFFICE OF STEPHANIE TOTI, ESQ. |
| Dr. Lendol L. Davis | |
| Alamo City Surgery Center d/b/a Alamo Women's Reproductive Services | Patrick J. O'Connell LAW OFFICES OF PATRICK J. O'CONNELL PLLC |
| | Hon. Jan Soifer formerly of O'CONNELL & SOIFER LLP |

| Defendant/Appellant | Counsel Who Have Appeared for Defendant/Appellant in This Case |
|---|---|
| Dr. John Hellerstedt, Commissioner of the Texas Department of State Health Services | Nichole Bunker-Henderson<br>James E. Davis<br>Todd Lawrence Disher<br>Scott A. Keller<br>Beth Klusmann<br>John S. Langley<br>Jeffrey C. Mateer<br>Ken Paxton<br>Brantley Starr<br>Craig M. Warner<br>OFFICE OF THE ATTORNEY GENERAL OF TEXAS |

**Other Persons with a Financial Interest in the Outcome of this Litigation**

Other Texas providers of pregnancy-related medical care; Texas funeral directors and funeral establishments; Texas vendors of medical waste disposal services

*/S/ David Brown*
David Brown
*Attorney for Plaintiffs/Appellees*

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ........................................................i

INTRODUCTION AND REQUEST FOR RELIEF ................................................1

I.    FACTS .........................................................................................................2

    A.    History of the Case ............................................................................2

    B.    The District Court's Preliminary Injunction .......................................3

        1.    The District Court's Vagueness Ruling ....................................3

        2.    The District Court's Undue Burden Ruling ..............................6

    C.    The Passage of SB 8 ..........................................................................8

II.    ARGUMENT ..............................................................................................10

# TABLE OF AUTHORITIES

**Page**

## CASES

*Bullfrog Films, Inc. v. Wick*,
  959 F.2d 778 (9th Cir. 1992) ......................................................... 12, 13

*City of Pontiac Retired Employees Ass'n v. Schimmel*,
  751 F.3d 427 (6th Cir. 2014) ...............................................................11

*Daingerfield Island Protective Soc. v. Lujan*,
  920 F.2d 32 (D.C. Cir. 1990) ...............................................................12

*Finberg v. Sullivan*,
  658 F.2d 93 (3d Cir. 1980) ...................................................................12

*Fusari v. Steinberg*,
  419 U.S. 379 (1975) ............................................................... 10, 11, 16

*Gomez v. Illinois State Bd. of Educ.*,
  811 F.2d 1030 (7th Cir. 1987) .............................................................13

*Green Party of Tennessee v. Hargett*,
  700 F.3d 816, 824 (6th Cir. 2012) .......................................................12

*Planned Parenthood of Southeastern Pennsylvania v. Casey*,
  505 U.S. 833 (1992) ...............................................................................6

*Smithfield Foods, Inc. v. Miller*,
  367 F.3d 1061 (8th Cir. 2004) .............................................................12

*State v. Jackson*,
  376 S.W.2d 341 (Tex. 1964) ...............................................................14

*Whole Woman's Health v. Hellerstedt*,
  136 S. Ct. 2292 (2016) ......................................................................6, 16

# TABLE OF AUTHORITIES

**Page**

## STATUTES, RULES, AND REGULATIONS

25 Tex. Admin. Code §§ 1.131-1.137 ....................................................... 2

30 Tex. Admin. Code § 326.1 (a) ............................................................. 4

30 Tex. Admin. Code § 326.53................................................................. 4

30 Tex. Admin. Code § 326.61................................................................. 4

Tex. Health & Safety Code § 716.304...................................................... 4

## INTRODUCTION AND REQUEST FOR RELIEF

This case is on appeal from a preliminary injunction of a 2016 Texas Department of Health Services (DSHS) regulation governing the disposal of fetal and embryonic tissue by healthcare facilities. The Texas Legislature recently enacted a statute also regulating the disposal of fetal and embryonic tissue, in a manner that differs from and conflicts with the regulation; the statute also calls for further rulemaking. Two days ago, Governor Greg Abbott signed the statute into law. Therefore, when this statute takes effect over the next few months, applicable Texas law will be different from the law considered and ruled on by the District Court now at issue in this appeal. Some aspects of the preliminary injunction may become moot; and the evidentiary record will reflect the impact of a regulatory regime different from the one in effect. Accordingly, this preliminary injunction appeal is no longer a proper use of the parties' or the Court's resources.

Thus, Appellees respectfully request that this appeal be **DISMISSED**. Appellees further request that this court **STAY BRIEFING** in this appeal pursuant to Fifth Circuit Rule 27.1.3 until the present motion to dismiss the appeal is decided. Appellees respectfully request that this stay be issued before June 29, 2017, the parties' next briefing deadline. It would be a waste of the parties' time and resources to submit further briefing in the event this appeal is dismissed. Counsel for Appellees

have contacted Counsel for Appellant, who have indicated that this motion will be opposed.

## I.    FACTS

**History of the Case**

The present case is a constitutional challenge to amendments to Texas regulations governing "special waste from health care-related facilities" (the "Amendments"), 25 Tex. Admin. Code §§ 1.131-1.137, which were published in the Texas Register on December 9, 2016, by the Texas Health and Human Services Commission (HHSC) on DSHS' behalf, ROA.607. Under prior "special waste" regulation, all "pathological waste" from healthcare facilities, including "fetuses" and the "products of spontaneous or induced human abortion," could generally be disposed of by healthcare facilities using any of seven methods, including the most commonly-used method of medical tissue disposal, "incineration followed by deposition of the residue in a sanitary landfill." *See* ROA.70, 85-88. The Amendments create a new category of "pathological waste" called "fetal tissue," and limit the ultimate disposition methods allowable for this category to just two, "cremation" and "interment." ROA.62. Appellees—Texas healthcare providers and facilities who provide pregnancy-related medical care—brought suit to enjoin the Amendments' violation of their and their patients' constitutional rights.

The Amendments were scheduled to take effect December 18, 2016. ROA.429. The present suit was filed on December 12. ROA.12-30. Following oral argument, the District Court issued a temporary restraining order on December 15. ROA.431. The court later held a two-day hearing, and on January 27, 2017, issued an order, preliminary enjoining Appellant Dr. John Hellerstedt, DSHS' Commissioner, from enforcing the Amendments. *See* ROA.602-624. That preliminary injunction is the subject of the present appeal.

**The District Court's Preliminary Injunction**

In its preliminary injunction opinion, the District Court held that Appellees would likely succeed on the merits of their claims that the Amendments were unconstitutionally vague and that they imposed an undue burden on women seeking pregnancy-related medical care. ROA.622.

*The District Court's Vagueness Ruling*

The Court ruled the Amendments vague for several reasons relevant to the present motion. ROA.613-14. One is their ambiguity over whether "fetal tissue" is regulated by Chapter 716 of the Texas Health & Safety Code, which provides limitations on where cremated "human remains" may be disposed. The Amendments themselves state explicitly that Chapter 716 does not apply to "fetal tissue." ROA.75. Notwithstanding that, DSHS argued in briefs that the Amendments "adopt[] by reference" a portion of Chapter 716, namely the statute's list of permissible locations

3

where cremated "human remains" may be scattered. *E.g.,* ROA.478 Further, DSHS'

briefs urged an interpretation of Chapter 716 itself which was at odds with the

statute's plain text and its own witness's interpretation of Chapter 716—leading

DSHS' to characterize its own witness's testimony as "ridiculous."[1] ROA.1155.

A second ambiguity is whether "fetal tissue" must be disposed of by a licensed

funeral director or by a licensed medical waste disposal firm. Although the

Amendments' plain text states that "fetal tissue" is "pathological waste," DSHS

argued that licensed funeral directors, who are permitted by the Funeral Services

Commission to handle "human remains," but not licensed to transport or process

medical waste, would nevertheless be able to accept "fetal tissue" for disposal.[2] The

---

[1] In greater detail, DSHS urged that, although Chapter 716 states that ashes may be scattered on "the private property of a consenting owner," Tex. Health & Safety Code § 716.304, Chapter 716 does not allow scattering ashes in locations "that just do[]n't make sense." ROA.1155; *see also* ROA.478-79 (some kinds of private property would be inconsistent with the Legislature's intent in enacting 716). However, DSHS' Deputy Commissioner, Ms. Sims, who certified DSHS' Fiscal Analysis, testified that ashes may be scattered in a "scrap yard" or "parking lot" under Chapter 716. ROA.941. It was this interpretation that Appellant's counsel called "ridiculous." ROA.1155:12-13. Moreover, Ms. McCoy, the Executive Director of the Texas Funeral Service Commission (the agency charged with enforcing Chapter 716), stated in a declaration in support of Appellant that Chapter 716 does not apply to the disposition of fetal tissue. ROA.1934.

[2] "The Texas Commission on Environmental Quality regulates storage, transportation, and disposal of medical waste and has a registration process for medical waste transporters and facilities receiving untreated medical waste. 30 TEX. ADMIN. CODE§§ 326.1 (a), 326.53, 326.61. Other [local] governmental authorities may have additional licensing requirements." ROA.620. Both witnesses Appellant called to testify to being willing to accept "fetal tissue" for disposal testified that

4

head of the Texas Funeral Commission, however, stated in a declaration that "fetal tissue" is not "human remains" under its licensing law. ROA.484.

The District Court also found the Amendments' definition of "fetal tissue"—in relevant part, "a fetus, body parts, organs, or other tissue from a pregnancy, not includ[ing] the umbilical cord, placenta, gestational sac, blood, or bodily fluids," ROA.604—vague, because neither Appellant's counsel nor any witness could say what "other tissue" exists in a pregnancy. ROA.613-14.

The District Court ruled that "the contradictory positions DSHS has taken over the short life of this lawsuit on whether fetal tissue is to be treated as human remains or as pathological waste, [including] arguing the ashes of fetal remains can be scattered in accordance with the law on human remains [and] claiming fetal tissue is not human remains but pathological waste" is "evidence of the unlimited and arbitrary discretion the Amendments vest in DSHS." ROA.613. The District Court ruled that "Plaintiffs must know whether ash from fetal tissue can be scattered in accordance with the rules for scattering the ash of human remains or if transport of fetal tissue must comply with the rules for transport of pathological waste rather than

---

they understood "fetal tissue" to be "human remains" and not "pathological waste," in contradiction to Texas law; they also testified that they had permits to handle "human remains" but not, as far as they could recall, "pathological waste." ROA.1058, 1106-1113.

rules for the transport of human remains. The lack of clarity in the Amendments invites arbitrary and discriminatory enforcement." ROA.613-14.

*The District Court's Undue Burden Ruling*

The District Court also ruled the Amendments impose an undue burden on women seeking pregnancy-related medical care under *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016), ROA.615-622, and *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992). The District Court considered numerous burdens imposed by the Amendments, including, among others: "undermining the constitutional protection afforded to personal beliefs and central to the liberty protected by the Fourteenth Amendment;" a scarcity of vendors willing, able, and licensed to dispose of "fetal tissue," which could lead to healthcare providers being unable to provide legal pregnancy-related medical care altogether; and the possibility that the Amendments would impose significant costs even on those healthcare providers who were able to find a vendor, which would then be passed on to their patients. ROA.619-622.

Relevant to the present motion, the District Court considered the testimony of several witnesses regarding the availability and cost of vendors. The District Court heard from two witnesses called by Appellant, the director of the state's highest-volume crematory business, and a representative of the Roman Catholic Church; each testified that although they would like to accept "fetal tissue" for disposition,

they had licenses to engage in funeral services but not, as far as they could recall, transporting and processing medical waste, as required under Texas law. ROA.1058, 1106-1113. Mr. Carnes, the funeral director, further testified that, if he could obtain the requisite license, he would charge about $2,350 for handling twenty-five "sets of fetal remains" from El Paso, where Appellee Reproductive Services maintains a clinic, and about $1,100 for a client in McAllen, where Appellee Whole Woman's Health has a clinic. ROA.1086-1098, 1126-27. The District Court heard conflicting testimony about cost from another Appellant witness, Ms. Sims, who is DSHS' Deputy Commissioner and who certified DSHS' "Fiscal Analysis" of the Amendments; Ms. Sims testified that the Fiscal Analysis concluded that the Amendments would cost all Texas abortion providers, collectively, just $300 per year in additional expenses.[3] The District Court heard further conflicting testimony on cost from an economist, Dr. Layne-Farrar, called by Appellees, who had conducted a cost-benefit analysis of the Amendments, including a survey of funeral homes. Dr. Layne-Farrar testified that most funeral homes would charge hundreds or thousands of dollars for each patient, and that she had identified a single Dallas-

---

[3] The District Court concluded DSHS' Fiscal Analysis was based on "back-of-the-envelope math" due to its many errors, omissions, and unfounded assumptions, and did not credit it. ROA.544. Ms. Sims also conceded the Fiscal Analysis did not apply to healthcare providers other than abortion clinics who would be impacted by the Amendments, including doctors' offices, forensic labs, and pathology labs. ROA.946.

area firm that could dispose of "fetal tissue," exclusive of shipping and transportation costs, for between $0.52 and $1.56 per patient, but that this facility was not confirmed to work with healthcare facilities outside of the Dallas area, and remained susceptible to dropping abortion providers customers due to pressure from anti-abortion activists or the State. The Court heard comparable testimony from Appellees, Dr. Davis and Whole Woman's Health's President and CEO, Ms. Hagstrom Miller, that funeral homes generally charge hundreds or thousands of dollars per client, and that disposal vendors are difficult for abortion clinics in particular to find and retain, due to pressure excerpted by the State and by anti-abortion activisim against businesses that work with abortion providers.

Applying the balancing analysis mandated by the Supreme Court in *Casey* and *Whole Woman's Health*, the District Court assessed the burdens imposed by the Amendments—including but not limited to the burdens on availability and pricing of vendors discussed *supra*—and weighed them against the benefits the Amendments purported to further. ROA.619-622. The District Court concluded that the latter outweighed the former, and therefore held the Amendments were likely unconstitutional. *Id.* at 623.

**The Passage of SB 8**

On June 6, 2017, Texas Governor Greg Abbott signed into law Senate Bill 8 ("SB 8") attached hereto as Exhibit A. Chapter 697 of SB 8 establishes a regulatory

scheme for "embryonic and fetal tissue remains" that is different from, and partially inconsistent with, the Amendments. SB 8, like the Amendments, provides for a limited number of methods of disposal. (Ex. A at 15-16). However, SB 8's definition of "embryonic and fetal tissue remains" is different from the Amendments, as it includes only "an embryo, a fetus, body parts, or organs from a pregnancy," omitting "other tissue from a pregnancy" from its definition. *Id*. at 14-15. Also contrary to the Amendments, which define "fetal remains" as a form of "pathological waste," SB 8 states, "[e]mbryonic and fetal tissue remains are not pathological waste under state law." *Id*. at 15. SB 8 also states that ashes "may not be placed in a landfill," in contrast to the Amendments, which do not mention landfills. *Id*. at 16. Finally, SB 8 provides for the "establish[ment] and maintain[ance of] a registry of participating funeral homes and cemeteries willing to provide free common burial or low-cost private burial [and] private nonprofit organizations that register with the department to provide financial assistance," which are not part of the Amendments. *Id*. at 16.

SB 8 also includes a "Fiscal Note," from the Legislature's Budged Board, attached hereto as Exhibit B, which reports on a survey of "costs associated with implementing the provisions of the bill" in public hospitals, which provides further evidence regarding compliance costs. (Ex. B at 2). The Fiscal Notes details survey responses from two hospitals: one indicates costs "per year per hospital range between $218,400-$655,200," and the other states "a cost of $1,060 for cremation

and $1,400 for burial," which would have applied to one hundred fetuses over a twelve month period. *Id*. These six-figure sums reported in the Fiscal Note are consistent with some of the conflicting evidence about cost discussed *supra*, and also inconsistent with some of the evidence.

SB 8's effective date is September 1, 2017. (Ex. A at 26). The bill also mandates HHSC to establish a "grant program" to provide financial assistance "for costs associated" with its implementation by October 1, 2017; and implementing regulations for "disposal of embryonic and fetal tissue remains" by no later than December 1, 2017. *Id*. at 23. SB 8 also provides that "the disposition of embryonic and fetal tissue remains that occurs before February 1, 2018, is governed by the law in effect immediately before the effective date of this Act, and the former law is continued in effect for that purpose." *Id*. at 24.

## II.    ARGUMENT

Where a challenged law is amended after a district court decision and pending an appeal, potentially changing the nature or extent of the alleged constitutional violation, the proper course of action is for an appellate court to remand the case to the district court for development of a record applicable to the amended law. *See Fusari v. Steinberg*, 419 U.S. 379, 386-89 (1975). An appellate court "must review the District Court's judgment in light of presently existing [state] law, not the law in effect at the time that judgment was rendered," and yet where "the statutory and

10

constitutional questions are significantly affected" by the change in underlying law, an appellate court is "unable meaningfully to assess the issues in th[e] appeal on the [district court] record." *Id.* at 387. In *Fusari*, the State of Connecticut had amended its procedure for assessing unemployment benefit eligibility after losing a Fourteenth Amendment challenge in district court, while the case was pending appeal to the Supreme Court. *Id.* at 379-380. The changes were made largely in response to the district court's decision. *Id.* at 380, 386-87. Accordingly, the Supreme Court remanded the case for reconsideration of the constitutional issues in light of the new procedure. *Id.* at 390.

This course of action respects the District Court's role as a court of first instance, and this Court of Appeal's role as an appellate court. It also safeguards against expending the limited resources of the Court and the parties on an appeal that will shortly become moot, or inconsistent with the underlying law and its application to the facts. Accordingly, this course of action is followed throughout the circuits. *See, e.g., City of Pontiac Retired Employees Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) ("Where a legislative enactment forming the basis of a live case or controversy is superseded by a legislative enactment that has not changed substantially from the initial one, the federal courts retain jurisdiction [and] the preferred procedure is to remand for reconsideration under the amended law") (citations and internal punctuation omitted); *Green Party of Tennessee v. Hargett*,

700 F.3d 816, 824 (6th Cir. 2012) (When "a change in law does not extinguish the controversy, the preferred procedure is for the court of appeals to remand the case to the district court for reconsideration of the case under the amended law. We normally pursue this course of action so that the district court may have an opportunity to pass judgment on the changed circumstances.") (citations and internal punctuation omitted); *Smithfield Foods, Inc. v. Miller*, 367 F.3d 1061, 1065-66 (8th Cir. 2004) (remanding where the record neither reflected the effect that the challenged statute, as amended, would have on interstate commerce, nor contained legislative history relevant to the amendments' purpose); *Bullfrog Films, Inc. v. Wick*, 959 F.2d 778, 781 (9th Cir. 1992) ("We decline to issue an opinion on the constitutionality of a regulation that may have been supplanted by [a] statute"); *Finberg v. Sullivan*, 658 F.2d 93, 99 (3d Cir. 1980) ("Absent an inquiry into the operation of the new rules, we are reluctant to hold that the new Pennsylvania [post-judgment] garnishment procedures fully satisfy the standard of due process as calculated in our opinion of October 27, 1980. This factual inquiry is properly addressed to the district court."); *cf. Daingerfield Island Protective Soc. v. Lujan*, 920 F.2d 32, 37 (D.C. Cir. 1990) (remanding for district court to determine in the first instance whether enactment of legislation requiring agency review of highway construction activities mooted certain of plaintiffs' claims against proposed highway construction); *Gomez v. Illinois State Bd. of Educ.*, 811 F.2d 1030, 1044 (7th Cir.

1987) (reversing district court's dismissal of plaintiffs' claim as moot where defendant had proposed regulations that would replace those challenged, and noting "a decision from us on this record about the proposed regulations would be premature").

The *Bullfrog* opinion addresses the same scenario as the present case: the plaintiffs challenged four agency regulations and obtained an injunction; the agency appealed; and in the interim Congress passed a statute concerning the same subject as the regulations. *Bullfrog Films, Inc.*, 959 F.2d at 779. The parties agreed that, to the extent the statute conflicted with the regulations, the former "supplanted" the latter, thus mooting three of the four claims. *Id.* at 781-82. The parties disputed how the statute would alter the implementation of the fourth challenged regulation. The Ninth Circuit declined to decide the issue in the first instance, noting, "[t]he statutory interpretation issue was not presented to the district court and has not been briefed or argued by the parties." *Id.* at 781. The Court dismissed the appeal and remanded for the entry of a new injunction that would protect the plaintiffs' rights while "consider[ing] new arguments as to the legality of the part of the regulations" at issue. *Id.* at 782.

As in *Bullfrog*, SB 8 conflicts with some parts of the challenged Amendments, while altering the effects of those that may remain in place. Upon taking effect, SB

8 will immediately invalidate the Amendments to the extent the two conflict,[4] as they do at several points. *Compare, e.g.,* Appellant's Br. at 41 ("As a matter of law, fetal tissue falls within the definition of pathological waste") *with* SB 8 ("Embryonic and fetal tissue remains are not pathological waste under state law."), (Ex. A at 15); ROA.49 (defining "fetal tissue" as "a fetus, body parts, organs, or other tissue from a pregnancy . . .") *with* SB 8 (defining "Embryonic and fetal tissue remains" as "an embryo, a fetus, body parts, or organs from a pregnancy . . ."), (Ex. A at 14).

Further, SB 8 requires rulemaking. Ex. A at 17 ("The executive commissioner shall adopt rules to implement this chapter"); *Id.* at 22 ("Not later than December 1, 2017, the executive commissioner [HHSC] shall adopt any rules necessary to implement . . . Chapter . . . 697, as added by this Act.") None of the parties can now be certain what the new rules will say, but it is certain that they will not be the same as the Amendments—at minimum, they will need to delete the provisions in conflict with SB 8, and provide for the creation of the non-profit, cemetery, and funeral home registries.

---

[4] *See State v. Jackson,* 376 S.W.2d 341, 344-45 (Tex. 1964) ("When the Legislature acts with respect to a particular matter, the administrative agency may not so act with respect to the matter as to nullify the Legislature's action even though the matter be within the agency's general regulatory field. There is little case law announcing the rule last stated, no doubt because it is self-evident.").

SB 8, and its implementing rules, will also give rise to different facts regarding the laws' impact, which the District Court will need to consider in the first instance. Some examples include: the extent, if any, to which SB 8's removal of "embryonic and fetal tissue remains" from the requirement of Texas law applicable to "pathological waste," Ex. A at 15, changes the availability of tissue disposal vendors; the extent to which the Amendments appear to apply to a different and seemingly larger set of facilities ("health-care facilities"), ROA.32, than SB 8 (any "health care facility in this state that provides health or medical care to a pregnant woman"), Ex. A at 15, and the impact of that difference on healthcare facilities and their patients; and the costs imposed on women seeking pregnancy-related medical care (including the six-figure, per-hospital compliance cost estimates included in SB 8's Fiscal Note, Ex. B at 2, and the potential impact of the non-profit, cemetery, and funeral home registries).

In sum, the current record does not allow this Court to consider the Amendments in a legal and factual context where "fetal tissue" is no longer "pathological waste," where healthcare facilities' obligations for handling "embryonic and fetal tissue remains" under SB 8 (and any additional rules HHSC may issue pursuant to SB 8) are different from those imposed by the Amendments, and where the evidence regarding the potential cost of compliance is different from the evidence considered by the District Court in January.

Critically, the District Court's vagueness analysis depended on language in the Amendments, including their definition of "fetal tissue" and their ambiguities regarding the Amendments' interaction with Texas's "pathological waste" and "human remains" regulations, which SB 8 has now superseded.

Likewise, the District Court's ruling that the Amendments imposed an undue burden depended on an assessment of burdens and benefits that will be different under SB 8, and about which new evidence will need to be introduced. As the Supreme Court has held, appellate review of the district court's rulings, in the context of a law that has changed, would be futile. *See Fusari*, 419 U.S. at 388-89 ("[W]e can only speculate how the new system might operate. . . . We are unable, therefore, to decide this appeal on its merits."). This is especially important in the context of an undue burden analysis, which is paradigmatically fact-based. *See Whole Woman's Health*, 136 S. Ct. at 2309-10 ("The rule announced in *Casey* . . . requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer. . . . [T]he Court, when determining the constitutionality of laws regulating abortion procedures, has placed considerable weight upon evidence and argument presented in judicial proceedings."). Any determination of whether Texas law governing the disposition of embryonic and fetal tissue imposes an undue burden would be based on an evidentiary record

regarding the superseded Amendments, and would therefore be an improper application of the undue burden test as to the Texas's actual law.

Moreover, the District Court's ruling is preliminary, and based on a preliminary record, and will require modification before SB 8 takes effect in any event. Appellees are today moving to reopen the District Court's current stay of proceedings, to seek amendment of the preliminary injunction in light of SB 8. Judicial economy will best be served by review, if any is necessary, of the District Court's amended preliminary injunction, and not the injunction in place over the superseded Amendments.

There is little to be gained from devoting this Court's resources to revisiting a preliminarily decision regarding a superseded law. An affirmation or rejection of the vagueness of a regulation defining "fetal tissue" as "pathological waste," which at all events must, by statute, be withdrawn and replaced by a regulation defining "fetal tissue" as "not pathological waste," little more than five months from now, would serve no purpose.[5] The best course of action here is to dismiss the appeal, and remand for further fact-finding and a modification of the District Court's preliminary

---

[5] Indeed, should this Court rule on the superseded Amendments and issue mandate taking effect before the February 1, 2018 date for the application of HHSC's new regulation "to the disposition of embryonic and fetal tissue remains," significant disruption is likely to occur throughout the Texas healthcare industry. Healthcare providers would have to act immediately to comply with the Amendments for the few days or weeks that they would be in effect, and then rush to comply again with the requirements of SB 8 and its implementing before February 1.

injunction as appropriate. This Court will then have the opportunity, should an appeal be taken, to review Texas law as it actually is, on a record applying the actual law to the facts. Neither this Court nor the parties will be required to devote resources to litigating the constitutionality of a regulation that has now been superseded by statute and will shortly be amended.

For the foregoing reasons, Appellees respectfully move this Court to **DISMISS** the present appeal. Appellees further move this Court to **STAY BRIEFING** pursuant to Fifth Circuit Rule 27.1.3 in this appeal until the present motion to dismiss the appeal is decided. Appellees respectfully request this Court to rule on their motion for a stay before June 29, 2017.

Respectfully submitted,

  */s/ David Brown*
 David P. Brown
 Molly Duane
 Caroline Sacerdote
 CENTER FOR REPRODUCTIVE RIGHTS
 199 Water Street, 22nd Floor
 New York, NY 10038
 (917) 637-3635 (DB phone)
 (917) 637-3631 (MD phone)
 (917) 637-6346 (CS phone)
 stoti@reprorights.org
 dbrown@reprorights.org

Patrick J. O'Connell
LAW OFFICES OF PATRICK J.
O'CONNELL PLLC
2525 Wallingwood Dr., Bldg. 14
Austin, Texas 78746
(512) 222-0444
pat@pjofca.com

Stephanie Toti
LAW OFFICE OF STEPHANIE TOTI
88 Atlantic Ave., Ste. 1B
Brooklyn, NY 11201
(516) 967-4110
stephanie_toti@outlook.com

J. Alexander Lawrence
MORRISON & FOERSTER LLP
250 W. 55th Street
New York, NY 10019
(212) 336-8638
alawrence@mofo.com

*Attorneys for Plaintiffs/Appellees*

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the word limit of Fed. R. App. P. 27(d)(2)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 4,763 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016.

*/S/ David Brown*
David Brown
*Attorney for Plaintiffs/Appellees*

## CERTIFICATE OF SERVICE

I hereby certify that, on June 8, 2016, the foregoing was served on the following counsel of record at the email addresses set forth below via the CM/ECF system:

Counsel for Defendant/Appellant

Beth Ellen Klusmann
beth.klusmann@oag.texas.gov

Scott A. Keller
scott.keller@oag.texas.gov

/S/ *David Brown*
David Brown

# Exhibit A

S.B. No. 8

1                        AN ACT

2  relating to certain prohibited abortions and the treatment and

3  disposition of a human fetus, human fetal tissue, and embryonic and

4  fetal tissue remains; creating a civil cause of action; imposing a

5  civil penalty; creating criminal offenses.

6         BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

7         SECTION 1.  Section 33.001(1), Family Code, is amended to

8  read as follows:

9              (1)  "Abortion" has the meaning assigned by Section

10 245.002, Health and Safety Code [means the use of any means to

11 terminate the pregnancy of a female known by the attending

12 physician to be pregnant, with the intention that the termination

13 of the pregnancy by those means will with reasonable likelihood

14 cause the death of the fetus].  This definition, as applied in this

15 chapter, [applies only to an unemancipated minor known by the

16 attending physician to be pregnant and] may not be construed to

17 limit a minor's access to contraceptives.

18        SECTION 2.  Section 161.006(b), Family Code, is amended to

19 read as follows:

20        (b)  In this code, "abortion" has the meaning assigned by

21 Section 245.002, Health and Safety Code [means an intentional

22 expulsion of a human fetus from the body of a woman induced by any

23 means for the purpose of causing the death of the fetus].

24        SECTION 3.  Section 170.001(1), Health and Safety Code, is

1

S.B. No. 8

1  amended to read as follows:

2  (1)  "Abortion" has the meaning assigned by Section

3  245.002 [means an act involving the use of an instrument, medicine,

4  drug, or other substance or device developed to terminate the

5  pregnancy of a woman if the act is done with an intention other than

6  to:

7  [(A)  increase the probability of a live birth of

8  the unborn child of the woman;

9  [(B)  preserve the life or health of the child; or

10  [(C)  remove a dead fetus].

11  SECTION 4.  Section 171.002(1), Health and Safety Code, is

12  amended to read as follows:

13  (1)  "Abortion" has the meaning assigned by Section

14  245.002 [means the use of any means to terminate the pregnancy of a

15  female known by the attending physician to be pregnant with the

16  intention that the termination of the pregnancy by those means

17  will, with reasonable likelihood, cause the death of the fetus].

18  SECTION 5.  Section 171.061(1), Health and Safety Code, is

19  amended to read as follows:

20  (1)  "Abortion" has the meaning assigned by Section

21  245.002. This definition, as applied in this subchapter, may not be

22  construed to apply to an act done with the intent to [means the act

23  of using, administering, prescribing, or otherwise providing an

24  instrument, a drug, a medicine, or any other substance, device, or

25  means with the intent to terminate a clinically diagnosable

26  pregnancy of a woman and with knowledge that the termination by

27  those means will, with reasonable likelihood, cause the death of

2

S.B. No. 8

1   ~~the woman's unborn child.  An act is not an abortion if the act is~~

2   ~~done with the intent to:~~

3                    [~~(A)  save the life or preserve the health of an~~

4   ~~unborn child;~~

5                    [~~(B)  remove a dead, unborn child whose death was~~

6   ~~caused by spontaneous abortion;~~

7                    [~~(C)  remove an ectopic pregnancy; or~~

8                    [~~(D)~~]  treat  a  maternal  disease  or  illness  for

9   which a prescribed drug, medicine, or other substance is indicated.

10      SECTION 6.  Chapter 171, Health and Safety Code, is amended

11  by adding Subchapters F and G to read as follows:

12              SUBCHAPTER F.  PARTIAL-BIRTH ABORTIONS

13      Sec. 171.101.  DEFINITIONS.  In this subchapter:

14              (1)  "Partial-birth  abortion"  means  an  abortion  in

15  which the person performing the abortion:

16                    (A)  for  the  purpose  of  performing  an  overt  act

17  that  the  person  knows  will  kill  the  partially  delivered  living

18  fetus,  deliberately  and  intentionally  vaginally  delivers  a  living

19  fetus until:

20                        (i)  for  a  head-first  presentation,  the

21  entire fetal head is outside the body of the mother; or

22                        (ii)  for a breech presentation, any part of

23  the fetal trunk past the navel is outside the body of the mother;

24  and

25                    (B)  performs the overt act described in Paragraph

26  (A),  other  than  completion  of  delivery,  that  kills  the  partially

27  delivered living fetus.

3

S.B. No. 8

1      (2) "Physician" means an individual who is licensed to

2 practice medicine in this state, including a medical doctor and a

3 doctor of osteopathic medicine.

4     Sec. 171.102. PARTIAL-BIRTH ABORTIONS PROHIBITED. (a) A

5 physician or other person may not knowingly perform a partial-birth

6 abortion.

7     (b) Subsection (a) does not apply to a physician who

8 performs a partial-birth abortion that is necessary to save the

9 life of a mother whose life is endangered by a physical disorder,

10 physical illness, or physical injury, including a life-endangering

11 physical condition caused by or arising from the pregnancy.

12     Sec. 171.103. CRIMINAL PENALTY. A person who violates

13 Section 171.102 commits an offense. An offense under this section

14 is a state jail felony.

15     Sec. 171.104. CIVIL LIABILITY. (a) Except as provided by

16 Subsection (b), the father of the fetus or a parent of the mother of

17 the fetus, if the mother is younger than 18 years of age at the time

18 of the partial-birth abortion, may bring a civil action to obtain

19 appropriate relief, including:

20      (1) money damages for physical injury, mental anguish,

21 and emotional distress; and

22      (2) exemplary damages equal to three times the cost of

23 the partial-birth abortion.

24     (b) A person may not bring or maintain an action under this

25 section if:

26      (1) the person consented to the partial-birth

27 abortion; or

4

S.B. No. 8

1      (2)  the person's criminally injurious conduct resulted

2 in the pregnancy.

3      Sec. 171.105. HEARING. (a) A physician who is the subject

4 of a criminal or civil action for a violation of Section 171.102 may

5 request a hearing before the Texas Medical Board on whether the

6 physician's conduct was necessary to save the life of a mother whose

7 life was endangered by a physical disorder, physical illness, or

8 physical injury, including a life-endangering physical condition

9 caused by or arising from the pregnancy.

10      (b) The board's findings under Subsection (a) are

11 admissible in any court proceeding against the physician arising

12 from that conduct. On the physician's motion, the court shall delay

13 the beginning of a criminal or civil trial for not more than 60 days

14 for the hearing to be held under Subsection (a).

15      Sec. 171.106. APPLICABILITY. A woman on whom a

16 partial-birth abortion is performed or attempted in violation of

17 this subchapter may not be prosecuted under this subchapter or for

18 conspiracy to commit a violation of this subchapter.

19      SUBCHAPTER G. DISMEMBERMENT ABORTIONS

20      Sec. 171.151. DEFINITION. In this subchapter,

21 "dismemberment abortion" means an abortion in which a person, with

22 the purpose of causing the death of an unborn child, dismembers the

23 living unborn child and extracts the unborn child one piece at a

24 time from the uterus through the use of clamps, grasping forceps,

25 tongs, scissors, or a similar instrument that, through the

26 convergence of two rigid levers, slices, crushes, or grasps, or

27 performs any combination of those actions on, a piece of the unborn

S.B. No. 8

1   child's body to cut or rip the piece from the body. The term does

2   not include an abortion that uses suction to dismember the body of

3   an unborn child by sucking pieces of the unborn child into a

4   collection container. The term includes a dismemberment abortion

5   that is used to cause the death of an unborn child and in which

6   suction is subsequently used to extract pieces of the unborn child

7   after the unborn child's death.

8         Sec. 171.152.  DISMEMBERMENT ABORTIONS PROHIBITED.  (a)  A

9   person may not intentionally perform a dismemberment abortion

10  unless the dismemberment abortion is necessary in a medical

11  emergency.

12        (b)  A woman on whom a dismemberment abortion is performed,

13  an employee or agent acting under the direction of a physician who

14  performs a dismemberment abortion, or a person who fills a

15  prescription or provides equipment used in a dismemberment abortion

16  does not violate Subsection (a).

17        Sec. 171.153.  CRIMINAL PENALTY.  (a)  A person who violates

18  Section 171.152 commits an offense.

19        (b)  An offense under this section is a state jail felony.

20        Sec. 171.154.  CONSTRUCTION OF SUBCHAPTER.  (a)  This

21  subchapter shall be construed, as a matter of state law, to be

22  enforceable to the maximum possible extent consistent with but not

23  further than federal constitutional requirements, even if that

24  construction is not readily apparent, as such constructions are

25  authorized only to the extent necessary to save the subchapter from

26  judicial invalidation. Judicial reformation of statutory language

27  is explicitly authorized only to the extent necessary to save the

S.B. No. 8

1    statutory provision from invalidity.

2         (b)  If any court determines that a provision of this

3    subchapter is unconstitutionally vague, the court shall interpret

4    the provision, as a matter of state law, to avoid the vagueness

5    problem and shall enforce the provision to the maximum possible

6    extent.  If a federal court finds any provision of this subchapter

7    or its application to any person, group of persons, or

8    circumstances to be unconstitutionally vague and declines to impose

9    the saving construction described by this subsection, the Supreme

10   Court of Texas shall provide an authoritative construction of the

11   objectionable statutory provisions that avoids the constitutional

12   problems while enforcing the statute's restrictions to the maximum

13   possible extent and shall agree to answer any question certified

14   from a federal appellate court regarding the statute.

15        (c)  A state executive or administrative official may not

16   decline to enforce this subchapter, or adopt a construction of this

17   subchapter in a way that narrows its applicability, based on the

18   official's own beliefs concerning the requirements of the state or

19   federal constitution, unless the official is enjoined by a state or

20   federal court from enforcing this subchapter.

21        (d)  This subchapter may not be construed to:

22             (1)  authorize the prosecution of or a cause of action

23   to be brought against a woman on whom an abortion is performed or

24   induced in violation of this subchapter; or

25             (2)  create or recognize a right to abortion or a right

26   to a particular method of abortion.

27        SECTION 7.  Subtitle H, Title 2, Health and Safety Code, is

1  amended by adding Chapter 173 to read as follows:

2          CHAPTER 173.  DONATION OF HUMAN FETAL TISSUE

3      Sec. 173.001.  DEFINITIONS.  In this chapter:

4          (1)  "Authorized facility" means:

5              (A)  a hospital licensed under Chapter 241;

6              (B)  a hospital maintained or operated by this

7  state or an agency of this state;

8              (C)  an ambulatory surgical center licensed under

9  Chapter 243; or

10             (D)  a birthing center licensed under Chapter 244.

11         (2)  "Human fetal tissue" means any gestational human

12  organ, cell, or tissue from an unborn child.  The term does not

13  include:

14             (A)  supporting cells or tissue derived from a

15  pregnancy or associated maternal tissue that is not part of the

16  unborn child; or

17             (B)  the umbilical cord or placenta, provided that

18  the umbilical cord or placenta is not derived from an elective

19  abortion.

20     Sec. 173.002.  APPLICABILITY.  This chapter does not apply

21  to:

22         (1)  human fetal tissue obtained for diagnostic or

23  pathological testing;

24         (2)  human fetal tissue obtained for a criminal

25  investigation;

26         (3)  human fetal tissue or human tissue obtained during

27  pregnancy or at delivery of a child, provided the tissue is obtained

S.B. No. 8

1  by an accredited public or private institution of higher education

2  for use in research approved by an institutional review board or

3  another appropriate board, committee, or body charged with

4  oversight applicable to the research; or

5          (4) cell lines derived from human fetal tissue or

6  human tissue existing on September 1, 2017, that are used by an

7  accredited public or private institution of higher education in

8  research approved by an institutional review board or another

9  appropriate board, committee, or body charged with oversight

10  applicable to the research.

11      Sec. 173.003.  ENFORCEMENT.    (a)  The department shall

12  enforce this chapter.

13      (b)  The attorney general, on request of the department or a

14  local law enforcement agency, may assist in the investigation of a

15  violation of this chapter.

16      Sec. 173.004.  PROHIBITED DONATION.  A person may not donate

17  human fetal tissue except as authorized by this chapter.

18      Sec. 173.005.  DONATION BY AUTHORIZED FACILITY.  (a)  Only

19  an authorized facility may donate human fetal tissue.    An

20  authorized facility may donate human fetal tissue only to an

21  accredited public or private institution of higher education for

22  use in research approved by an institutional review board or

23  another appropriate board, committee, or body charged with

24  oversight applicable to the research.

25      (b)  An authorized facility may not donate human fetal tissue

26  obtained from an elective abortion.

27      Sec. 173.006.  INFORMED CONSENT REQUIRED.  An authorized

S.B. No. 8

1  facility may not donate human fetal tissue under this chapter

2  unless the facility has obtained the written, voluntary, and

3  informed consent of the woman from whose pregnancy the fetal tissue

4  is obtained.  The consent must be provided on a standard form

5  prescribed by the department.

6      Sec. 173.007.  CRIMINAL PENALTY.  (a)  A person commits an

7  offense if the person:

8          (1)  offers a woman monetary or other consideration to:

9              (A)  have an abortion for the purpose of donating

10  human fetal tissue; or

11             (B)  consent to the donation of human fetal

12  tissue; or

13         (2)  knowingly or intentionally solicits or accepts

14  tissue from a fetus gestated solely for research purposes.

15     (b)  An offense under this section is a Class A misdemeanor

16  punishable by a fine of not more than $10,000.

17     (c)  With the consent of the appropriate local county or

18  district attorney, the attorney general has concurrent

19  jurisdiction with that consenting local prosecutor to prosecute an

20  offense under this section.

21     Sec. 173.008.  RECORD RETENTION.  Unless another law

22  requires a longer period of record retention, an authorized

23  facility may not dispose of any medical record relating to a woman

24  who consents to the donation of human fetal tissue before:

25         (1)  the seventh anniversary of the date consent was

26  obtained under Section 173.006; or

27         (2)  if the woman was younger than 18 years of age on

S.B. No. 8

1  the date consent was obtained under Section 173.006, the later of:

2               (A)  the woman's 23rd birthday; or

3               (B)  the seventh anniversary of the date consent

4  was obtained.

5     Sec. 173.009.  ANNUAL REPORT.  An authorized facility that

6  donates human fetal tissue under this chapter shall submit an

7  annual report to the department that includes for each donation:

8               (1)  the specific type of fetal tissue donated; and

9               (2)  the accredited public or private institution of

10  higher education that received the donation.

11     SECTION 8.  Section 245.002, Health and Safety Code, is

12  amended by amending Subdivisions (1) and (4-a) and adding

13  Subdivision (4-b) to read as follows:

14             (1)  "Abortion" means the act of using or prescribing

15  an instrument, a drug, a medicine, or any other substance, device,

16  or means with the intent to cause the death of an unborn child of a

17  woman known to be pregnant [an act or procedure performed after

18  pregnancy has been medically verified and with the intent to cause

19  the termination of a pregnancy other than for the purpose of either

20  the birth of a live fetus or removing a dead fetus].  The term does

21  not include birth control devices or oral contraceptives.  An act is

22  not an abortion if the act is done with the intent to:

23              (A)  save the life or preserve the health of an

24  unborn child;

25              (B)  remove a dead, unborn child whose death was

26  caused by spontaneous abortion; or

27              (C)  remove an ectopic pregnancy.

S.B. No. 8

1          (4-a)  "Ectopic pregnancy" means the implantation of a

2     fertilized egg or embryo outside of the uterus.

3          (4-b)  "Executive  commissioner"  means  the  executive

4     commissioner of the Health and Human Services Commission.

5          SECTION 9.  Section 245.005(e), Health and Safety Code, is

6     amended to read as follows:

7          (e)  As a condition for renewal of a license, the licensee

8     must submit to the department the annual license renewal fee and an

9     annual  report[, including  the  report  required  under  Section

10    245.011].

11         SECTION 10.  The  heading  to  Section  245.011,  Health  and

12    Safety Code, is amended to read as follows:

13         Sec. 245.011.  PHYSICIAN  REPORTING  REQUIREMENTS;  CRIMINAL

14    PENALTY.

15         SECTION 11.  Section  245.011,  Health  and  Safety  Code,  is

16    amended by amending Subsections (a), (b), (d), and (e) and adding

17    Subsections (f) and (g) to read as follows:

18         (a)  A physician  who  performs  an  abortion  at  an  [Each]

19    abortion facility must complete and submit a monthly [an annual]

20    report to the department on each abortion [that is] performed by the

21    physician at the abortion facility.  The report must be submitted on

22    a form provided by the department.

23         (b)  The report may not identify by any means [the physician

24    performing the abortion or] the patient.

25         (d)  Except as provided by Section 245.023, all information

26    and  records  held  by  the  department  under  this  chapter  are

27    confidential and are not open records for the purposes of Chapter

S.B. No. 8

1   552, Government Code.  That information may not be released or made

2   public on subpoena or otherwise, except that release may be made:

3          (1)  for statistical purposes, but only if a person,

4   patient, physician performing an abortion, or abortion facility is

5   not identified;

6          (2)  with the consent of each person, patient,

7   physician, and abortion facility identified in the information

8   released;

9          (3)  to medical personnel, appropriate state agencies,

10  or county and district courts to enforce this chapter; or

11         (4)  to appropriate state licensing boards to enforce

12  state licensing laws.

13     (e)  A person commits an offense if the person violates

14  Subsection (b), (c), or (d) [this section].  An offense under this

15  subsection is a Class A misdemeanor.

16     (f)  Not later than the 15th day of each month, a physician

17  shall submit to the department the report required by this section

18  for each abortion performed by the physician at an abortion

19  facility in the preceding calendar month.

20     (g)  The department shall establish and maintain a secure

21  electronic reporting system for the submission of the reports

22  required by this section.  The department shall adopt procedures to

23  enforce this section and to ensure that only physicians who perform

24  one or more abortions during the preceding calendar month are

25  required to file the reports under this section for that month.

26         SECTION 12.  Chapter 245, Health and Safety Code, is amended

27  by adding Sections 245.0115 and 245.0116 to read as follows:

S.B. No. 8

1     Sec. 245.0115. NOTIFICATION. Not later than the seventh

2    day after the date the report required by Section 245.011 is due,

3    the commissioner of state health services shall notify the Texas

4    Medical Board of a violation of that section.

5     Sec. 245.0116. DEPARTMENT REPORT. (a) The department

6    shall publish on its Internet website a monthly report containing

7    aggregate data of the information in the reports submitted under

8    Section 245.011.

9     (b) The department's monthly report may not identify by any

10   means an abortion facility, a physician performing the abortion, or

11   a patient.

12    SECTION 13. Subtitle B, Title 8, Health and Safety Code, is

13   amended by adding Chapter 697 to read as follows:

14   CHAPTER 697. DISPOSITION OF EMBRYONIC AND FETAL TISSUE REMAINS

15    Sec. 697.001. PURPOSE. The purpose of this chapter is to

16   express the state's profound respect for the life of the unborn by

17   providing for a dignified disposition of embryonic and fetal tissue

18   remains.

19    Sec. 697.002. DEFINITIONS. In this chapter:

20    (1) "Cremation" means the irreversible process of

21   reducing remains to bone fragments through direct flame, extreme

22   heat, and evaporation.

23    (2) "Department" means the Department of State Health

24   Services.

25    (3) "Embryonic and fetal tissue remains" means an

26   embryo, a fetus, body parts, or organs from a pregnancy that

27   terminates in the death of the embryo or fetus and for which the

1   issuance of a fetal death certificate is not required by state law.

2   The term does not include the umbilical cord, placenta, gestational

3   sac, blood, or body fluids.

4           (4)  "Executive  commissioner"  means  the  executive

5   commissioner of the Health and Human Services Commission.

6           (5)  "Incineration"  means  the  process  of  burning

7   remains in an incinerator.

8           (6)  "Interment"  means  the  disposition  of  remains  by

9   entombment, burial, or placement in a niche.

10          (7)  "Steam disinfection" means the act of subjecting

11  remains to steam under pressure to disinfect the remains.

12      Sec. 697.003.  APPLICABILITY OF OTHER LAW.  Embryonic and

13  fetal tissue remains are not pathological waste under state law.

14  Unless otherwise provided by this chapter, Chapters 711 and 716 of

15  this code and Chapter 651, Occupations Code, do not apply to the

16  disposition of embryonic and fetal tissue remains.

17      Sec. 697.004.  DISPOSITION OF EMBRYONIC AND FETAL TISSUE

18  REMAINS.  (a)  Subject to Section 241.010, a health care facility

19  in this state that provides health or medical care to a pregnant

20  woman shall dispose of embryonic and fetal tissue remains that are

21  passed or delivered at the facility by:

22          (1)  interment;

23          (2)  cremation;

24          (3)  incineration followed by interment; or

25          (4)  steam disinfection followed by interment.

26      (b)  The ashes resulting from the cremation or incineration

27  of embryonic and fetal tissue remains:

S.B. No. 8

1          (1)  may be interred or scattered in any manner as
2    authorized by law for human remains; and
3          (2)  may not be placed in a landfill.
4     (c)  A health care facility responsible for disposing of
5    embryonic and fetal tissue remains may coordinate with an entity in
6    the registry established under Section 697.005 in an effort to
7    offset the cost associated with burial or cremation of the
8    embryonic and fetal tissue remains of an unborn child.
9     (d)  Notwithstanding any other law, the umbilical cord,
10   placenta, gestational sac, blood, or body fluids from a pregnancy
11   terminating in the death of the embryo or fetus for which the
12   issuance of a fetal death certificate is not required by state law
13   may be disposed of in the same manner as and with the embryonic and
14   fetal tissue remains from that same pregnancy as authorized by this
15   chapter.
16    Sec. 697.005.  BURIAL OR CREMATION ASSISTANCE REGISTRY.  The
17   department shall:
18          (1)  establish and maintain a registry of:
19                (A)  participating funeral homes and cemeteries
20   willing to provide free common burial or low-cost private burial;
21   and
22                (B)  private nonprofit organizations that
23   register with the department to provide financial assistance for
24   the costs associated with burial or cremation of the embryonic and
25   fetal tissue remains of an unborn child; and
26          (2)  make the registry information available on request
27   to a physician, health care facility, or agent of a physician or

16

S.B. No. 8

1  health care facility.

2      Sec. 697.006.  ETHICAL FETAL REMAINS GRANT PROGRAM.  The

3  department  shall  develop  a  grant  program  that  uses  private

4  donations to provide financial assistance for the costs associated

5  with disposing of embryonic and fetal tissue remains.

6      Sec. 697.007.  SUSPENSION OR REVOCATION OF LICENSE.  The

7  department  may  suspend  or  revoke  the  license  of  a  health  care

8  facility that violates this chapter or a rule adopted under this

9  chapter.

10      Sec. 697.008.  CIVIL PENALTY.  (a)  A person that violates

11  this chapter or a rule adopted under this chapter is liable for a

12  civil penalty in an amount of $1,000 for each violation.

13      (b)  The attorney general, at the request of the department,

14  may sue to collect the civil penalty.  The attorney general may

15  recover  reasonable  expenses  incurred  in  collecting  the  civil

16  penalty,  including  court  costs,  reasonable  attorney's  fees,

17  investigation costs, witness fees, and disposition expenses.

18      Sec. 697.009.  RULES.  The  executive  commissioner  shall

19  adopt rules to implement this chapter.

20      SECTION 14.  Section  164.052(a),  Occupations  Code,  is

21  amended to read as follows:

22      (a)  A physician or an applicant for a license to practice

23  medicine commits a prohibited practice if that person:

24          (1)  submits  to  the  board  a  false  or  misleading

25  statement,  document,  or  certificate  in  an  application  for  a

26  license;

27          (2)  presents to the board a license, certificate, or

17

S.B. No. 8

1  diploma that was illegally or fraudulently obtained;

2          (3)  commits fraud or deception in taking or passing an
3  examination;

4          (4)  uses alcohol or drugs in an intemperate manner
5  that, in the board's opinion, could endanger a patient's life;

6          (5)  commits unprofessional or dishonorable conduct
7  that is likely to deceive or defraud the public, as provided by
8  Section 164.053, or injure the public;

9          (6)  uses an advertising statement that is false,
10 misleading, or deceptive;

11         (7)  advertises professional superiority or the
12 performance of professional service in a superior manner if that
13 advertising is not readily subject to verification;

14         (8)  purchases, sells, barters, or uses, or offers to
15 purchase, sell, barter, or use, a medical degree, license,
16 certificate, or diploma, or a transcript of a license, certificate,
17 or diploma in or incident to an application to the board for a
18 license to practice medicine;

19         (9)  alters, with fraudulent intent, a medical license,
20 certificate, or diploma, or a transcript of a medical license,
21 certificate, or diploma;

22         (10)  uses a medical license, certificate, or diploma,
23 or a transcript of a medical license, certificate, or diploma that
24 has been:

25                 (A)  fraudulently purchased or issued;

26                 (B)  counterfeited; or

27                 (C)  materially altered;

18

S.B. No. 8

1    (11)  impersonates or acts as proxy for another person
2  in an examination required by this subtitle for a medical license;

3    (12)  engages in conduct that subverts or attempts to
4  subvert an examination process required by this subtitle for a
5  medical license;

6    (13)  impersonates a physician or permits another to
7  use the person's license or certificate to practice medicine in
8  this state;

9    (14)  directly or indirectly employs a person whose
10  license to practice medicine has been suspended, canceled, or
11  revoked;

12    (15)  associates in the practice of medicine with a
13  person:

14      (A)  whose license to practice medicine has been
15  suspended, canceled, or revoked; or

16      (B)  who has been convicted of the unlawful
17  practice of medicine in this state or elsewhere;

18    (16)  performs or procures a criminal abortion, aids or
19  abets in the procuring of a criminal abortion, attempts to perform
20  or procure a criminal abortion, or attempts to aid or abet the
21  performance or procurement of a criminal abortion;

22    (17)  directly or indirectly aids or abets the practice
23  of medicine by a person, partnership, association, or corporation
24  that is not licensed to practice medicine by the board;

25    (18)  performs an abortion on a woman who is pregnant
26  with a viable unborn child during the third trimester of the
27  pregnancy unless:

S.B. No. 8

1          (A) the abortion is necessary to prevent the
2  death of the woman;

3          (B) the viable unborn child has a severe,
4  irreversible brain impairment; or

5          (C) the woman is diagnosed with a significant
6  likelihood of suffering imminent severe, irreversible brain damage
7  or imminent severe, irreversible paralysis;

8          (19) performs an abortion on an unemancipated minor
9  without the written consent of the child's parent, managing
10  conservator, or legal guardian or without a court order, as
11  provided by Section 33.003 or 33.004, Family Code, unless the
12  abortion is necessary due to a medical emergency, as defined by
13  Section 171.002, Health and Safety Code;

14          (20) otherwise performs an abortion on an
15  unemancipated minor in violation of Chapter 33, Family Code; or

16          (21) performs or induces or attempts to perform or
17  induce an abortion in violation of Subchapter C, F, or G, Chapter
18  171, Health and Safety Code.

19     SECTION 15. Section 164.055(b), Occupations Code, is
20  amended to read as follows:

21     (b) The sanctions provided by Subsection (a) are in addition
22  to any other grounds for refusal to admit persons to examination
23  under this subtitle or to issue a license or renew a license to
24  practice medicine under this subtitle. The criminal penalties
25  provided by Section 165.152 do not apply to a violation of Section
26  170.002, Health and Safety Code, or Subchapter C, F, or G, Chapter
27  171, Health and Safety Code.

S.B. No. 8

1    SECTION 16.  Section 48.02(a), Penal Code, is amended to

2 read as follows:

3    (a)  In this section, "human ["Human] organ" means the human

4 kidney, liver, heart, lung, pancreas, eye, bone, skin, [fetal

5 tissue,] or any other human organ or tissue, but does not include

6 hair or blood, blood components (including plasma), blood

7 derivatives, or blood reagents.  The term does not include human

8 fetal tissue as defined by Section 48.03.

9    SECTION 17.  Chapter 48, Penal Code, is amended by adding

10 Section 48.03 to read as follows:

11    Sec. 48.03.  PROHIBITION ON PURCHASE AND SALE OF HUMAN FETAL

12 TISSUE.  (a)  In this section, "human fetal tissue" has the meaning

13 assigned by Section 173.001, Health and Safety Code.

14    (b)  A person commits an offense if the person knowingly

15 offers to buy, offers to sell, acquires, receives, sells, or

16 otherwise transfers any human fetal tissue for economic benefit.

17    (c)  An offense under this section is a state jail felony.

18    (d)  It is a defense to prosecution under this section that

19 the actor:

20        (1)  is an employee of or under contract with an

21 accredited public or private institution of higher education; and

22        (2)  acquires, receives, or transfers human fetal

23 tissue solely for the purpose of fulfilling a donation authorized

24 by Section 173.005, Health and Safety Code.

25    (e)  This section does not apply to:

26        (1)  human fetal tissue acquired, received, or

27 transferred solely for diagnostic or pathological testing;

21

S.B. No. 8

1          (2) human fetal tissue acquired, received, or
2   transferred solely for the purposes of a criminal investigation;
3          (3) human fetal tissue acquired, received, or
4   transferred solely for the purpose of disposing of the tissue in
5   accordance with state law or rules applicable to the disposition of
6   human fetal tissue remains;
7          (4)  human fetal tissue or human tissue acquired during
8   pregnancy or at delivery of a child, provided the tissue is acquired
9   by an accredited public or private institution of higher education
10  for use in research approved by an institutional review board or
11  another appropriate board, committee, or body charged with
12  oversight applicable to the research; or
13         (5) cell lines derived from human fetal tissue or
14  human tissue existing on September 1, 2017, that are used by an
15  accredited public or private institution of higher education in
16  research approved by an institutional review board or another
17  appropriate board, committee, or body charged with oversight
18  applicable to the research.
19         (f) With the consent of the appropriate local county or
20  district attorney, the attorney general has concurrent
21  jurisdiction with that consenting local prosecutor to prosecute an
22  offense under this section.
23       SECTION 18. (a) Not later than December 1, 2017, the
24  executive commissioner of the Health and Human Services Commission
25  shall adopt any rules necessary to implement Section 245.011,
26  Health and Safety Code, as amended by this Act, and Chapters 173 and
27  697, Health and Safety Code, as added by this Act.

S.B. No. 8

1      (b)  The Department of State Health Services shall:

2          (1)  as soon as practicable after the effective date of
3  this Act, develop the electronic reporting system required by
4  Section 245.011, Health and Safety Code, as amended by this Act;

5          (2)  not later than October 1, 2017, establish the
6  grant program required by Section 697.006, Health and Safety Code,
7  as added by this Act;

8          (3)  not later than December 1, 2017, prescribe the
9  standard consent form required by Section 173.006, Health and
10 Safety Code, as added by this Act; and

11         (4)  not later than February 1, 2018, begin to award
12 grants under the grant program described by Subdivision (2) of this
13 subsection.

14     SECTION 19.  (a)  Subchapters F and G, Chapter 171, Health
15 and Safety Code, as added by this Act, apply only to an abortion
16 performed on or after the effective date of this Act.  An abortion
17 performed before the effective date of this Act is governed by the
18 law in effect immediately before the effective date of this Act, and
19 that law is continued in effect for that purpose.

20     (b)  Sections 173.003, 173.004, 173.005, and 173.006, Health
21 and Safety Code, as added by this Act, apply to a donation of human
22 fetal tissue that occurs on or after the effective date of this Act,
23 regardless of whether the human fetal tissue was acquired before,
24 on, or after that date.

25     (c)  An authorized facility is not required to make an
26 initial annual report under Section 173.009, Health and Safety
27 Code, as added by this Act, before January 1, 2019.

23

S.B. No. 8

1      (d) Chapter 697, Health and Safety Code, as added by this
2  Act, applies only to the disposition of embryonic and fetal tissue
3  remains that occurs on or after February 1, 2018. The disposition
4  of embryonic and fetal tissue remains that occurs before February
5  1, 2018, is governed by the law in effect immediately before the
6  effective date of this Act, and the former law is continued in
7  effect for that purpose.

8      (e) Chapter 48, Penal Code, as amended by this Act, applies
9  only to an offense committed on or after the effective date of this
10  Act. An offense committed before the effective date of this Act is
11  governed by the law in effect on the date the offense was committed,
12  and the former law is continued in effect for that purpose. For
13  purposes of this subsection, an offense was committed before the
14  effective date of this Act if any element of the offense occurred
15  before that date.

16      SECTION 20. It is the intent of the legislature that every
17  provision, section, subsection, sentence, clause, phrase, or word
18  in this Act, and every application of the provisions in this Act to
19  each person or entity, are severable from each other. If any
20  application of any provision in this Act to any person, group of
21  persons, or circumstances is found by a court to be invalid for any
22  reason, the remaining applications of that provision to all other
23  persons and circumstances shall be severed and may not be affected.

24      SECTION 21. (a) If some or all of the provisions of this
25  Act are ever temporarily or permanently restrained or enjoined by
26  judicial order, all other provisions of Texas law regulating or
27  restricting abortion shall be enforced as though the restrained or

S.B. No. 8

1   enjoined provisions had not been adopted; provided, however, that

2   whenever the temporary or permanent restraining order or injunction

3   is stayed or dissolved, or otherwise ceases to have effect, the

4   provisions shall have full force and effect.

5       (b)  Mindful of Leavitt v. Jane L., 518 U.S. 137 (1996), in

6   which in the context of determining the severability of a state

7   statute regulating abortion the United States Supreme Court held

8   that an explicit statement of legislative intent is controlling, it

9   is the intent of the legislature that every provision, section,

10  subsection, sentence, clause, phrase, or word in this Act, and

11  every application of the provisions in this Act, are severable from

12  each other.  If any application of any provision in this Act to any

13  person, group of persons, or circumstances is found by a court to be

14  invalid, the remaining applications of that provision to all other

15  persons and circumstances shall be severed and may not be affected.

16  All constitutionally valid applications of this Act shall be

17  severed from any applications that a court finds to be invalid,

18  leaving the valid applications in force, because it is the

19  legislature's intent and priority that the valid applications be

20  allowed to stand alone.  Even if a reviewing court finds a provision

21  of this Act to impose an undue burden in a large or substantial

22  fraction of relevant cases, the applications that do not present an

23  undue burden shall be severed from the remaining provisions and

24  shall remain in force, and shall be treated as if the legislature

25  had enacted a statute limited to the persons, group of persons, or

26  circumstances for which the statute's application does not present

27  an undue burden.  The legislature further declares that it would

25

S.B. No. 8

1  have passed this Act, and each provision, section, subsection,

2  sentence, clause, phrase, or word, and all constitutional

3  applications of this Act, irrespective of the fact that any

4  provision, section, subsection, sentence, clause, phrase, or word,

5  or applications of this Act, were to be declared unconstitutional

6  or to represent an undue burden.

7       (c)  If any provision of this Act is found by any court to be

8  unconstitutionally vague, then the applications of that provision

9  that do not present constitutional vagueness problems shall be

10  severed and remain in force.

11      SECTION 22.  This Act takes effect September 1, 2017.

26

S.B. No. 8

_____          _____
     President of the Senate                  Speaker of the House

    I hereby certify that S.B. No. 8 passed the Senate on March 15, 2017, by the following vote:  Yeas 24, Nays 6; and that the Senate concurred in House amendments on May 26, 2017, by the following vote: Yeas 22, Nays 9.

 

                                                  _____
                                          Secretary of the Senate

    I hereby certify that S.B. No. 8 passed the House, with amendments, on May 20, 2017, by the following vote:  Yeas 93, Nays 45, one present not voting.

 

                                                  _____
                                          Chief Clerk of the House

Approved:

_____
             Date

_____
           Governor

# Exhibit B

# LEGISLATIVE BUDGET BOARD
## Austin, Texas

## FISCAL NOTE, 85TH LEGISLATIVE REGULAR SESSION

## May 21, 2017

**TO:** Honorable Dan Patrick, Lieutenant Governor, Senate

**FROM:** Ursula Parks, Director, Legislative Budget Board

**IN RE:** **SB8** by Schwertner (Relating to certain prohibited abortions and the treatment and disposition of a human fetus, human fetal tissue, and embryonic and fetal tissue remains; creating a civil cause of action; imposing a civil penalty; creating criminal offenses.), **As Passed 2nd House**

---

**No significant fiscal implication to the State is anticipated.**

---

The bill would prohibit certain partial-birth abortions, would classify the violation of that prohibition as a state jail felony, and would authorize civil action against a physician who conducted the prohibited procedure. The bill would allow a physician to seek a hearing before the Texas Medical Board to determine medical necessity of the procedure. The bill would add partial-birth abortions to the list of prohibited actions applicable to physicians or applicants for a license to practice medicine, making them subject to disciplinary action by the Texas Medical Board or the revoking of their license. The bill would prohibit certain dismemberment abortions and would establish a criminal penalty (state jail felony) for a violation of the prohibition. The bill would add dismemberment abortions to the list of prohibited actions applicable to physicians or applicants for a license to practice medicine, making them subject to disciplinary action by the Texas Medical Board or the revoking of their license. The bill would establish requirements governing the donation of human fetal tissue and would create a Class A misdemeanor offense for committing certain acts related to fetal tissue donation. The Department of State Health Services (DSHS) would be required to develop a standardized consent form for the donation of human fetal tissue. The bill would require certain facilities to submit annual reports to DSHS regarding fetal tissue donations. The bill would prohibit the sale or trade of human fetal tissue and would classify the knowing violation of that prohibition as a state jail felony. The bill would authorize the Attorney General to assist in certain investigations and prosecute certain offenses related to donation or trade/sale of fetal tissue. The bill would require health care facilities to dispose of fetal remains following certain criteria. DSHS would be required to create and maintain a registry of certain entities that can assist with costs associated with burial or cremation of fetal remains. Additionally, DSHS would be required to make the registry information available to certain parties on request. DSHS would be required to develop a grant program that uses private donations to provide financial assistance for the costs associated with fetal remains disposition by October 1, 2017 and begin to award grants by February 1, 2018. DSHS would be permitted to suspend or revoke the licenses of health care facilities that do not comply with fetal remains disposition criteria. The non-complying facility would be liable for a civil penalty for each violation and, at the request of DSHS, the Attorney General would be allowed to file a suit to collect the penalty. The bill would amend various sections of the Health and Safety Code and the Family Code to update the definition of abortion. The bill would amend Chapter 245 of the Health and Safety Code and require certain physicians that perform abortions to submit monthly reports to DSHS,

rather than on an annual basis. DSHS would be required to establish an electronic reporting system for report submissions. DSHS would be required to notify the Texas Medical Board of any physicians that violate the reporting requirement. DSHS would be required to publish a monthly report of aggregated data from the reports on its Internet website. The executive commissioner of the Health and Human Services Commission (HHSC) would be required to adopt any rules necessary to implement certain provisions of the bill by December 1, 2017.

According to DSHS, implementing and maintaining the grant program will require additional staffing. It is assumed the cost of providing grants under the grant program would be dependent on the level of donations received, which cannot be estimated at this time; however, it is assumed there would be no net fiscal impact as all donations would be distributed as grants. According to DSHS, technology costs will be required to create the electronic reporting system for physicians report submissions. According to DSHS, additional staff will be required to validate data with abortion providers on a monthly basis and to prepare the monthly reports to be published on their Internet website. It is assumed that these costs can be absorbed by the agency.

According to HHSC, the University of Texas System, the Office of Court Administration, the Texas Medical Board, the Texas Department of Criminal Justice, and the Office of Attorney General, the provisions of the bill can be implemented within existing resources. This analysis assumes the provisions of the bill addressing felony sanctions for criminal offenses would not result in a significant impact on state correctional agencies.

## Local Government Impact

According to the Texas Association of Counties, the fiscal impact to counties to implement the provisions of the bill would not be significant.

Under the provisions of the bill, an offense would be a Class A misdemeanor, punishable by a fine of not more than $10,000. Costs associated with enforcement and prosecution could likely be absorbed within existing resources. Revenue gain from fines imposed and collected is not anticipated to have a significant fiscal implication.

Certain hospitals that are units of local government reported via survey by the Texas Hospital Association (THA) estimates of costs associated with implementing the provisions of the bill: In the survey, Texas hospital number 1 indicated 1680 fetal remains specimens per year. For each burial, costs range between $130-$390 depending on which funeral home is used. Thus, THA reported the burial costs per year per hospital range between $218,400-$655,200.

In the same survey, THA indicated that Texas hospital number 2 reported that their existing funeral home contract specifies a cost of $1,060 for cremation and $1,400 for burial. In the last 12 months, hospital number 2 handled 100 fetuses of less than 350 grams not including specimens of fetal tissue, which are not currently tracked.

**Source Agencies:**    212 Office of Court Administration, Texas Judicial Council, 302 Office of the Attorney General, 503 Texas Medical Board, 529 Health and Human Services Commission, 537 State Health Services, Department of, 696 Department of Criminal Justice, 720 The University of Texas System Administration

**LBB Staff:**   UP, JPo, AG, LR, RGU, KCA, JSm, JGA